## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,
STATE OF CALIFORNIA,
STATE OF COLORADO,
STATE OF FLORIDA,
STATE OF GEORGIA,
STATE OF NEW JERSEY,
STATE OF NEW YORK,
STATE OF NORTH CAROLINA, and
STATE OF TENNESSEE,
*Ex rel.* ROY L. BOLINGER,

        Plaintiffs/Relators,

        v.

24th STREET, INC., f/k/a RMB, INC.,
f/k/a RECEIVABLES
MANAGEMENT BUREAU, INC.,
RUBIN AND RAINE OF NEW JERSEY,
LLC,
RUBIN AND RAINE HOLDINGS, LP,
RUBIN AND RAINE OF COLORADO,
LLC,
and WAKEFIELD & ASSOCIATES, INC.,

        Defendants.

Civil Action No. 18-15446 (RK) (JTQ)

### OPINION

**KIRSCH, District Judge**

      **THIS MATTER** comes before the Court upon Defendant Wakefield & Associates, Inc.'s

("Wakefield") Motion to Dismiss, (ECF No. 59), the Second Amended Complaint, (ECF No. 58),

of Relator Roy L. Bolinger ("Relator"). Relator filed an opposition brief, (ECF No. 62), and

Wakefield filed a reply brief, (ECF No. 63). The Court has considered the parties' submissions

and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and

Local Civil Rule 78.1. For the reasons set forth below, Defendant's Motion to Dismiss is **DENIED**.

# I.    BACKGROUND

## A.    PROCEDURAL HISTORY

On October 16, 2018, Relator, on behalf of the United States and the States of California, Colorado, Florida, Georgia, New Jersey, New York, North Carolina, and Tennessee, filed a complaint against RMB, Inc. f/k/a Receivables Management Bureau, Inc. ("RMB"), Rubin and Raine Holdings, LP ("RR Holdings"), Rubin and Raine of New Jersey, LLC ("RR NJ"), and Rubin and Raine of Colorado, LLC ("RR CO") and alleging claims under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA") and various state counterparts, as well as a claim for retaliatory discharge. (ECF No. 1.) On January 8, 2019, the matter was administratively stayed following an application by the United States. (ECF No. 3.)

The case was reopened on October 14, 2020, (ECF No. 6), and on March 9, 2021, the United States, California, Colorado, Florida, Georgia, New Jersey, New York, and Tennessee declined to intervene, (ECF No. 7). On March 21, 2023, the Honorable Douglas E. Arpert, U.S.M.J. (ret.) granted Relator's Motion to Amend, (ECF No. 46), and on March 27, 2023, Relator filed an Amended Complaint, (ECF No. 47), against the above defendants and Wakefield (collectively, "Defendants"). Following a Motion to Dismiss the Amended Complaint by Defendant, (ECF No. 50), Relator filed a Motion for Leave to File a Second Amended Complaint, (ECF No. 56), which was granted by Judge Arpert on September 13, 2023, (ECF No. 57).

Relator filed a Second Amended Complaint on September 14, 2023 against RMB, RR Holdings, RR NJ, and RR CO, and added Wakefield as a Defendant (collectively, "Defendants"). (*See generally*, SAC," ECF No. 58 ¶ 1.) As previously asserted, the 67-paged, 286-paragraphed pleading alleges claims under the FCA and various state counterparts, as well as a claim for retaliatory discharge. (*Id.*) In essence, Relator, a former employee of RMB and a successor

Defendant, alleges that these third-party medical billing companies engaged in fraudulent Medicaid and Medicare billing. (*Id.*)

Relator asserts claims under the FCA (Counts 1–3), the California False Claims Act, Cal. Gov.'t. Code § 12650 (Counts 4–6), Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-305 (Counts 7–9), Florida False Claims Act, Fla. Stat. § 68.082 (Counts 10–12), Georgia False Claims Act, Ga. Code. Ann. § 23-3-121 and the Georgia False Medicaid Claims Act, Ga. Code. Ann. § 49-4-168 (Counts 13–18), New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-3 (Counts 19–21), New York False Claims Act, N.Y. State Fin. Law § 189 (Counts 22–24), North Carolina False Claims Act, N.C. Gen. Stat. § 1-607 (Counts 25–27), and Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-182 and Tennessee False Claims Act, Tenn. Code Ann. § 4-180-103 (Counts 28–33), as well as a claim for retaliatory discharge in violation of the FCA, Tennessee Medicaid False Claims Act, and Tennessee False Claims Act (Count 34).

Thereafter, on September 28, 2023, Wakefield moved to dismiss the SAC, (ECF No. 59), and filed a brief in support, ("MTD," ECF No. 59-1). On November 13, 2023, Relator filed an opposition brief, ("Opp'n Br.," ECF No. 62), and on December 8, 2023, Wakefield filed a reply brief, ("Reply," ECF No. 63). The Court now turns to the subject motion.

###    B.    FACTUAL BACKGROUND

The following facts are derived from Relator's Second Amended Complaint and accepted as true only for purposes of deciding the subject motion. As stated, this suit concerns allegations of fraudulent Medicaid and Medicare billing by a number of medical billing companies—RMB, RR Holdings, RR NJ, RR CO, and Wakefield. (SAC ¶ 1.)[1]

---

[1] While separate entities, Relator asserts that Wakefield is a continuation of RMB through a series of mergers. (*See* SAC ¶¶ 27–33.) Relator alleges that in 2013, RMB merged with Rubin and Raine, RR CO and RR NJ. (SAC ¶ 28.) Following the merger, Relator states that the companies "combined office

In 2010, Relator began working for RMB in their Medical Collections Department in Knoxville, Tennessee. (SAC ¶ 22.) RMB is a "third-party medical billing compan[y]" that works with hospital systems "to bill and collect on medical claims." (*Id.* ¶ 3.) Relator was promoted to Pre-Legal Administrator in the Legal Department, transferring to the Marietta, Georgia office in 2014. (*Id.* ¶ 22) In 2015, the Marietta Georgia office was closed, and Relator was transferred back to the Knoxville office where he began working as a Pre-Screen ("PSU") Supervisor. (*Id.* ¶¶ 22–23.) In this new role, Relator reported directly to the Director of Revenue Cycle, Mary Stohl ("Stohl") and also had between twelve to fifteen direct reports. (*Id.* ¶¶ 24–26.)

Relator's SAC asserts 34 counts for violations of the FCA and various state law counterparts, as well as a claim for retaliatory discharge. (SAC ¶¶ 219–86.) At a high level, Relator contends that, based on his personal experience working at RMB and its successors, Defendants, "illegally, intentionally, and for financial gain defrauded government healthcare programs such as Medicare, Medicaid, and multiple other government funded healthcare programs (collectively hereinafter "Government Payors") by submitting and causing others to submit false claims for reimbursement." (*Id.* ¶ 2.) Relator alleges that Defendants instructed its employees to modify, *inter alia*, billing codes, procedures and diagnosis codes, without any approval or basis in patient records, to engage in "assumptive coding," and billing "without support documentation." (*Id.* ¶ 5 (citations omitted).) Relator contends that because Defendants received a percentage of every

---

locations" and continued operations in Tennessee, New Jersey, Colorado, North Carolina, and Georgia. (*Id.* ¶ 29.) Thereafter, around 2018, Relator alleges that Wakefield merged with RMB, acquiring RMB's liabilities. (*Id.* ¶¶ 31–32.) Relator alleges that "Wakefield was a mere continuation of [RMB's] prior business and operations because [RMB] thereafter continued to operate business as usual as it had done before the 2018 merger, while under the same management and executives . . . utilizing the same physical locations, office addresses, and other assets." (*Id.* ¶ 33.) On November 30, 2018, Relator claims RMB changed its name to 24th Street, Inc. (*Id.* ¶ 31.)

dollar collected, they were "motivated and incentivized to engage in this fraudulent conduct." (*Id.* ¶ 6.)

Relator alleges that Defendants submitted claims pursuant both to Medicare and Medicaid. (*Id.* ¶¶ 42–52.) Under Medicare, benefits are only paid "for medically necessary services rendered by eligible and appropriately licensed providers." (*Id.* ¶ 43.) Claims submitted for reimbursement must include "diagnosis and procedure codes" which indicate the reasons and type of medical care provided. (*Id.* ¶¶ 55–57.) Medicare requires the use of a standardized set of both diagnostic and procedural codes. (*Id.* ¶¶ 58–59.) Relator alleges that "truthful and accurate diagnosis codes on Medicare claims is a condition of Medicare payment for those services" and physicians are required "to certify that that the information provided on the claim is true, accurate and complete, and that the services listed on the claim were medically indicated and necessary to the health of the patient." (*Id.* ¶ 62 (quotation marks omitted).) Similarly, under Medicaid, a provider seeking reimbursement "must submit a signed claims form to the state's Medicaid program, certifying that the information on the form is 'true, accurate, and complete.'" (*Id.* ¶ 49 (quoting 42 C.F.R. § 455.18).)

Relator alleges he discovered Defendants' fraudulent activities upon his promotion to PSU Supervisor. (*Id.* ¶ 66.) Relator alleges, *inter alia*, numerous fraudulent "course[s] of misconduct," including "falsely impersonating clients to obtain payment under false pretenses," "directing employees to falsify . . . codes on collections of denied claims without any access or reference to patient medical records or information," "falsifying claims to circumvent Government Payor's exhaustion requirements without any access or reference to patient medical records or information," and "fraudulently changing procedure codes from 'diagnostic' to 'preventative'" in order to receive full as opposed to partial reimbursement of the claimed amount. (*Id.* ¶ 67.)

According to Relator, RMB allowed non-credentialed employees to access sensitive client information that allowed them to alter client coding information to submit fraudulent claims for reimbursement. Relator contends that Defendants' clients allowed access only to Defendants' employees once they completed the client's respective training. (*Id.* ¶¶ 83–85.) However, according to Relator, Defendants required employees to share their credentials with employees who had not completed the training, and thus did not have permission to access the clients' systems. (*Id.*) For example, Relator alleges that Stohl required he share his credentials for the Orlando Health hospital system, despite Relator only receiving credentials upon agreeing to keep this information confidential and not share with unauthorized users. (*Id.* ¶¶ 87–88.) Stohl then passed Relator's credentials to other employees, including Sherry Martinez ("Martinez"), a Senior Insurance Specialist. (*Id.* ¶¶ 89–91.) Once Martinez had access to Orlando Health's systems, she "regularly altered material coding information on the Government Payor forms, and then resubmitted those claims to Government Payors for reimbursement." (*Id.* ¶ 91.) Martinez allegedly altered "at least 35 claims, resulting in fraudulent billing" of approximately $198,000. (*Id.* ¶¶ 92–93.)

In other situations, Relator alleges that Defendants' "employees regularly resubmitted denied claims to Government Payors while falsely impersonating its Clients." (*Id.* ¶ 100.) For example, Relator claims that Defendants altered clients' letterheads to appear that the claims were approved by the client. (*Id.* 102–03.) Defendants could then alter the diagnosis or billing codes to resubmit the payments. (*Id.*) Relator alleges that employees would "re-create blank Government Payor forms in order to rewrite the history of denied claims on behalf of its Clients, so that the altered claims would be paid by Government Payors." (*Id.* ¶ 107.)

Relator also alleges that the employees he supervised would "create[] brand new Government Payor forms and fraudulently enter[] pertinent payment information therein," including altering the diagnosis codes that differed from the information previously submitted and denied. (*Id.* ¶ 124.) In one such instance, Relator contends that he discovered a previously terminated employee, who was a "close acquaintance" of Stohl, was rehired and tasked by Stohl to resubmit previously denied claims. (*Id.* ¶¶ 134–36.) St. Vincent's Health Systems, a client with whom Relator worked, complained that Defendants had altered billing codes "on denied Medicaid claims and resubmit[ed] the altered claims to Medicaid . . . without [St. Vincent's] authorization. (*Id.* ¶¶ 137–38.)

The SAC includes numerous examples of alleged instances where Defendants altered the diagnosis codes before submitting them to the Government payors for reimbursement. (*Id.* ¶¶ 146–160.) For example, Relator alleges that a January 23, 2017 claim was originally denied due to covering only a back injury, as the patient's medical coverage only covered mental health benefits. (*Id.* ¶ 147.) RMB "falsely changed the diagnosis code to indicate a mental health diagnosis and re-submitted to Medicaid for payment." (*Id.*) In other instances, RMB falsified claims to indicate that the injuries did not result from motor vehicle accidents, which would require exhaustion of a driver's "Personal Injury Protection Insurance" before being submitted to Medicaid. (*Id.* ¶¶ 161–67.) As a result, "Government Payers processed and paid the entire claim," instead of first requiring that the Personal Injury Protection was first used to cover the claim. (*Id.*)

In addition, Relator alleges "Stohl instructed and trained employees" to alter claims from "diagnostic" to "preventative." (*Id.* ¶ 176–83.) As the SAC explains, only a percentage of "diagnostic" claims are covered under the Medicaid and Medicare, whereas the full claim is paid for "preventative" procedures. (*Id.*) Relator alleges that RMB commonly altered colonoscopy

procedures from "diagnostic" to "preventative," resulting "in at least 100-200 fraudulent claims per year for a total of $300,000 annually paid by Government Payors." (*Id.* ¶¶ 182–83.)

Finally, Relator alleges that he brought his concerns regarding the fraudulent schemes to Stohl, who "dismissed" his concerns. (*Id.* ¶ 142.) Thereafter, "she retaliated against Relator for raising these concerns and falsely documented his personnel file." (*Id.*) Relator was terminated on April 24, 2017 based on what he alleges were "false pretenses." (*Id.* ¶ 23.)

## II.   <u>LEGAL STANDARD</u>

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the court may dismiss a complaint for "failure to state a claim upon which relief can be granted." For a complaint to survive dismissal under this rule, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating the sufficiency of a complaint, "[a]ll allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (citations omitted). However, the Court "need not credit bald assertions or legal conclusions" or allegations "involv[ing] fantastic factual scenarios lacking any arguable factual or legal basis" or that "surpass all credulity." *Degrazia v. F.B.I.*, No. 08-1009, 2008 WL 2456489, at *3 (D.N.J. June 13, 2008), *aff'd*, 316 F. App'x 172 (3d Cir. 2009) (citations and quotation marks omitted).

A court must only consider "the complaint, exhibits attached to the complaint, matters of the public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550

U.S. at 555. Furthermore, "[a] pleading that offers labels and conclusions or a formulistic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (citations and quotation marks omitted). "Restatements of the elements of a claim are legal conclusions, and therefore, are not entitled to a presumption of truth." *Valentine v. Unifund CCR, Inc.*, No. 20-5024, 2021 WL 912854, at *1 (D.N.J. Mar. 10, 2021) (citing *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011)).

For fraud claims, a complaint is subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard "[i]ndependent of the standard applicable to Rule 12(b)(6) motions." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Rule 9(b)'s heightened pleading standard "ensure[s] that defendants are placed on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (citations and quotations omitted). "A plaintiff alleging fraud must therefore support [the] allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.'" *United States v. Johnson & Johnson*, No. 12-7758, 2017 WL 2367050, at *2 (D.N.J. May 31, 2017) (quoting *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries*, LLC, 812 F.3d 294, 307 (3d Cir. 2016)). Rule 9(b)'s requirements may be "relaxe[d]" when the plaintiff "demonstrate[s] that specific information is in the exclusive control of the defendant." *Weske v. Samsung Elecs., Am., Inc.*, 934 F. Supp. 2d 698, 703 (D.N.J. 2013).

### III.    <u>DISCUSSION</u>

Wakefield moves to dismiss the SAC on a number of grounds. First, Wakefield contends that the SAC fails to state a claim because the SAC contains "shotgun pleadings" by grouping together the Defendants and failing to specify the misconduct applicable to each individual Defendant. (MTD at 6.) Next, Wakefield avers that Relator fails to allege that Wakefield engaged in conduct which violated the FCA and its state counterparts. (*Id.* at 7–9.) Third, Wakefield also argues that Relator fails to state a claim under the FCA because Relator fails to allege "the submission of false claims . . . a basic threshold requirement for an FCA violation." (*Id.* at 9.) Fourth, Wakefield contends that Relator fails to meet the heightened pleading standard under Rule 9(b). (*Id.* at 12–19.) Fifth, Wakefield argues that the *Qui Tam* provisions of the FCA are unconstitutional, and as such, Relator lacks standing to assert his claims. (*Id.* at 19–20.) Finally, Wakefield argues that because Relator's FCA claims fail, his claims under the state counterparts must also fail as the state law claims also are subject to a heightened pleading standard. (*Id.* at 20.) Wakefield also contends that the Court should decline to assert supplemental jurisdiction over the state law claims. (*Id.* at 21.)

In opposition, Relator argues that that the SAC sufficiently alleges violations of the FCA. (Opp'n Br. at 6–7.) Relator contends that "because Relator alleges that Defendants submitted falsified patient records to the Government Payors, Relator sufficiently alleges that Defendants presented claims for payments to the Government." (*Id.* at 7.) Relator further contends that his allegations demonstrate that these submitted claims were falsified, and RMB had knowledge of this conduct. (*Id.* at 9–11.) As such, Relator contends that he has pled the *prima facie* elements of an FCA claim. (*Id.* at 12–15.) In response to Defendant's argument that the SAC utilizes shotgun pleading and fails to allege wrongdoing against Wakefield, Relator argues that Wakefield is a

continuation of RMB and thus, under the doctrine of successor liability, liable for the wrongdoing of RMB. (*Id.* at 16–17.) As to his state law claims, Relator avers that because he has stated a claim under the FCA, his state law claims also are sufficiently alleged. (*Id.* at 18.) Finally, Relator argues that Supreme Court precedent makes clear he has standing to assert these claims. (*Id.* at 18.)

A. PLEADING SUFFICIENCY AND ALLEGATIONS AGAINST WAKEFIELD

The Court first turns to Wakefield's arguments regarding Relator's alleged shotgun pleading and failure to allege conduct specifically against Wakefield. A "successor employer" is "one who 'has acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations.'" *Napolitano v. BAE Sys. N. Am., Inc.*, No. 04-4286, 2005 WL 1703193, at *3 n.4 (D.N.J. July 20, 2005) (quoting *Golden State Bottling Co. v. NLRB,* 414 U.S. 168 (1973)). "Under New Jersey law, a successor may be liable if '(1) the successor expressly or impliedly assumes the predecessor's liabilities; (2) there is actual or de facto consolidation or merger of the seller and the purchaser; (3) the purchaser is a mere continuation of the seller; or (4) the transaction is entered into fraudulently to escape liability.'" *Ortho-Clinical Diagnostics, Inc. v. Physicians Stat Lab, Inc.*, No. 21-2530, 2021 WL 4284581, at *2 (D.N.J. Sept. 21, 2021) (quoting *Pastor Enters. v. GKN Driveline N. Am., Inc.*, No. 19-21872, 2020 WL 5366286, at *3 (D.N.J. Sept. 8, 2020)); *see also Premier Pork L.L.C. v. Westin, Inc.*, No. 07-1661, 2008 WL 724352, at *4 (D.N.J. Mar. 17, 2008) (collecting cases for the proposition that "a plaintiff's claim of successorship liability is satisfied by general allegations of successorship").

In the case at bar, Relator alleges Wakefield is a successor in interest of the other Defendants. (*See* SAC ¶¶ 27–33.) Wakefield does not contest this point. Instead, Wakefield argues that Relator's successor liability argument "misses the point here" as "Relator does not sufficiently plead a claim as against Wakefield." (Reply at 4.) Wakefield, in pertinent part, alleges that:

> [Relator's SAC] lumped together five separate defendants and
> ascribed to them, *en masse,* a wrongful and separate intent to
> defraud the United States in connection with thousands of
> unspecified billing requests. In fact, throughout the [SAC], Relator
> makes no effort whatsoever to draw a distinction between the
> conduct of any of the individual defendants.

(MTD at 6.) Relator's opposition brief, and indeed the SAC itself, refutes this unpersuasive

argument:

> Relator alleges that the same business engaged in the same fraud
> over several years; all that changed with each merger was the
> entity name. And as a mere continuation of Rubin and Raine/RMB,
> Wakefield inherited and assumed that entity's liabilities, even if, as
> Wakefield suggests, its misconduct magically stopped the day
> Relator left its employ.

(Opp'n Br. at 1.)

Wakefield's argument ignores the allegations in the SAC. Relator contends that in 2013

RMB merged with Rubin and Raine, RR Co and RR NJ. (SAC ¶ 28.) Following the merger, Relator

states that the companies "combined office locations" and continued operations in Tennessee, New

Jersey, Colorado, North Carolina and Georgia. (*Id.* ¶ 29.) Thereafter, around 2018, Relator alleges

that Wakefield merged with RMB, acquiring RMB's liabilities. (*Id.* ¶¶ 31–32.) Relator alleges that

"Wakefield was a mere continuation of [RMB's] prior business and operations because [RMB]

thereafter continued to operate business as usual as it had done before the 2018 merger, while

under the same management and executives, as well as while utilizing the same physical locations,

office addresses, and other assets. (*Id.* ¶ 33.) As such, at this stage in the proceeding, the SAC

adequately alleges a theory of successor liability. *See Ortho-Clinical*, 2021 WL 4284581, at *3

(holding allegations relating to, *inter alia*, merger agreement, "carrying on the same business," and

maintaining same offices alleged claim of successor liability). Moreover, because Relator alleges

successor liability, the Court finds that Relator has not engaged in shotgun pleading. Rather,

Relator's theory is that Wakefield is responsible for the conduct of all Defendants. Accordingly, the Court rejects Defendant's argument that Relator's SAC must be dismissed for both alleged shotgun pleading and for failing to allege facts against Wakefield.[2]

### B.  FAILURE TO STATE A CLAIM

Counts 1 through 3 of the SAC assert claims for violations of the FCA. Relator alleges that Wakefield violated 31 U.S.C. § 3729(a)(1)(A) when it "presented false or fraudulent claims for payment, or knowingly caused false or fraudulent claims for payment to be presented, to officials of the United States government." (SAC ¶ 220.) Relator also contends that Wakefield violated 31 U.S.C. § 2729(a)(1)(B) when "it knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims." (*Id.* ¶ 221.) Finally, Relator alleges that Wakefield, in violation of 31 U.S.C. § 2729(a)(1)(G), "knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government" and "wrongfully received overpayment from Medicare for millions of dollars and purposely withheld it knowing it was wrongly received." (*Id.* ¶¶ 222–23.) Wakefield moves to dismiss these claims, arguing that the SAC fails to allege the submission of false claims or allege facts with sufficient particularity under Rule 9(b). (Opp'n Br. at 9–19.)

The False Claims Act imposes liability on "any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes,

---

[2] Defendant does not move to dismiss Relator's retaliatory discharge on grounds other than stating that Relator's discharge occurred prior to Wakefield's acquisition of RMB. (*See* MTD at 7.) As the Court finds that Relator has adequately alleged successor liability, the Court denies Defendant's attempt to dismiss the retaliatory discharge claim on these same grounds—that Relator alleges Wakefield is responsible for the actions of its predecessor companies.

uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C.A. § 3729(a)(1)(A), (B), (G). The FCA seeks "to reach all types of fraud . . .  that might result in financial loss to the Government." *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 486 (3d Cir. 2017) (quoting *Cook Cty. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003)).

To establish a *prima facie* case under these provisions of the FCA, a plaintiff must show that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305–06 (3d Cir. 2011). A false claim under the FCA may be factually false or legally false. *See United States v. Loving Care Agency, Inc.*, 226 F. Supp. 3d 357, 364 (D.N.J. 2016) (citing *Wilkins*, 659 F.3d at 305). "A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." *Wilkins*, 659 F.3d at 305.

A legally false claim "is based on a false certification theory of liability." *Id.* (citations and quotation marks omitted). There are two types of legally false claims: "express false certification and implied false certification." *United States ex rel. Allstate Ins. Co. v. Phoenix Toxicology & Lab Servs., LLC*, No. 22-6303, 2024 WL 2785396, at *8 (D.N.J. May 30, 2024). "[A]n entity is liable under the FCA [under an express theory] for falsely certifying that it is in compliance with

regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds." *Wilkins*, 659 F.3d at 305. "Under the implied variety, liability 'attaches when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment.'" *Allstate*, 2024 WL 2785396, at *8 (quoting *Wilkins*, 659 F.3d at 305). Under either theory, "FCA falsity simply asks whether the claim submitted to the government as reimbursable was in fact reimbursable, based on the conditions for payment set by the government." *United States v. Care Alternatives*, 952 F.3d 89, 97 (3d Cir. 2020).

To satisfy the heightened pleading standard under Rule 9(b), a plaintiff "must provide 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 157–58 (3d Cir. 2014) (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)). The "mere opportunity for fraud will not suffice." *Id.* Instead, the Relator must allege "[s]ufficient facts to establish 'a plausible ground for relief.'" *Id.* (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009)). The requirement under Rule 9(b) can be satisfied either by "(1) by pleading the date, place, or time of the fraud; or (2) using an alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Loving Care*, 226 F. Supp. 3d at 363 (citations and internal quotation marks omitted). However, a plaintiff need not "identify a specific claim for payment *at the pleading stage* of the case to state a claim for relief." *Foglia*, 754 F.3d at 156 (quoting *Wilkins,* 659 F.3d at 308) (emphasis in original).

Wakefield moves to dismiss only on the second prong of the *prima facie* test, arguing that Relator fails to "allege the submission of false claims [] that would establish a violation of the

FCA." (MTD at 9.) According to Wakefield, "Relator levies numerous allegations of supposed wrong-doing" without contending that any claims were actually submitted. (*Id.*)

The Court finds that Relator's SAC both adequately alleges a prima facie FCA violation and satisfies the heightened pleading standard of Rule 9(b). First, Relator contends that Defendants submitted claims to Medicare and Medicaid, thus constituting submission of payments to the United States. *See U.S. ex rel. Monahan v. Robert Wood Johnson Univ. Hosp. at Hamilton*, No. 02-5702, 2009 WL 1288962, at *6 (D.N.J. May 7, 2009) ("Defendant submitted forms to the Medicare program for payment which satisfies the first prong of the prima facie test . . . ."); *United States v. Aguillon*, 628 F. Supp. 2d 542, 547 (D. Del. 2009) (collecting cases for the proposition that Medicare and Medicaid carriers "are considered agents of the United States for the purposes of the FCA").

Second, Relator alleges that Defendants engaged in numerous types of fraudulent activity. Relator contends that Defendants, *inter alia*, altered diagnosis codes prior to submitting them to Government Payors, (SAC ¶¶ 146–60), "removed the auto-accident identifiers" in various claims, (*Id.* ¶¶ 161–72), and modified procedures from "diagnostic" to "preventative" in order to submit claims that the Government Payors would cover, (*Id.* ¶¶ 176–83). The allegations in the SAC, contrary to Wakefield's argument, allege the submission of false claims. For example, Relator alleges that Martinez altered coding information on claims submitted on behalf of Orlando Health, resulting in the overpayment of $198,000. (*Id.* ¶¶ 91–93.) Relator also alleges that, on behalf of St. Vincent's, employees submitted false claims to Medicaid. (*Id.* ¶ 139.) Similarly, Relator contends that RMB altered motor vehicle accident submissions, resulting in overpayments upwards of five million dollars. (*Id.* ¶¶ 155-59, 170.) As yet another example, Relator alleges claims were altered from "diagnostic" to "preventative," causing overpayment of $300,000 annually. (*Id.* ¶¶ 180–82.)

As such, Relator satisfies the second prong of the prima facie burden. *See U.S. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 243 (3d Cir. 2004) (holding that plaintiff alleged violation of the FCA where complaint alleged defendant "certified its compliance with federal health care law knowing that certification to be false"); *United States ex rel. Lord v. NAPA Mgmt. Servs. Corp.*, No. 03:13-2940, 2017 WL 2653164, at *8 (M.D. Pa. June 20, 2017) ("[I]t is clear that if a defendant falsely certifies compliance regarding claims submitted to Medicare which violate the law, this constitutes a false claim submitted to the government under the FCA."); *Loving Care Agency*, 226 F. Supp. 3d at 367 ("'It is no great leap for the Court to infer' that purportedly legally false records could form the basis of claims for Medicare reimbursement." (quoting *Druding v. Care Alts., Inc.*, 164 F.Supp.3d 621, 630–31 (D.N.J. 2016)).

Finally, the third prong of Relator's *prima facie* case requires that Wakefield "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information . . . ." *U.S. ex rel. Bartlett v. Ashcroft*, 39 F. Supp. 3d 656, 674 (W.D. Pa. 2014) (quoting *Zimmer*, 386 F.3d at 241). Relator contends that Defendants "trained and instructed the employees to collect on denied claims by any means necessary, including by fraud, and also to resubmit fraudulently 'corrected' claims . . ." (SAC ¶ 115.) In addition, with respect to Defendants' scheme to impersonate its clients to submit claims, Relator contends that Defendants "instructed employees *not* to inform the Government Payors and insurance companies, when communicating with them, that they work for a collection agency." (*Id.* ¶ 106 (emphasis in original).) Relator also contends that his concerns were "dismissed" and he was retaliated against and terminated for raising same. (*Id.* ¶ 142.) As such, Relator adequately satisfies the third prong of the prima facie test. *See Monahan*, 2009 WL

1288962, at *8 (finding complaint satisfied third prong of prima facie case where defendant "knew its submissions for payment for reimbursement . . . were fraudulent").

Moreover, Relator provides "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted," *Foglia*, 754 F.3d at 157–58, and as such, Relator satisfies the pleading standards of Rule 9(b). At the pleading stage, Relator need not "provide specific claims submitted to the Government." *Loving Care Agency*, 226 F. Supp. 3d at 366. Rather, Relator is "only required to allege facts that allow the Court to plausibly infer that fraudulent claims were submitted." *Id.*

As described above, Relator both provides allegations of the motivation for and details regarding the fraudulent schemes. Relator contends that RMB were paid a percentage—ranging from 14 to 17 percent—of each dollar collected for a client. (SAC ¶¶ 69–70.) Thus, Relator alleges that RMB "was motivated to falsify medical claims" in order to boost its own compensation. (*Id.* ¶ 68.) As the Third Circuit held in *Foglia*, Medicare "provides an opportunity for the sort of fraud alleged." *Foglia*, 754 F.3d at 158. As discussed above, based on a theory of successor liability, Relator contends that Wakefield is liable for the actions of its predecessor companies. (*Id.* ¶¶ 28–33.) Relator alleges that RMB and its employees, *inter alia*, altered billing codes, changed the type of care from diagnostic to preventative, and altered motor vehicle claims in order to receive full, as opposed partial reimbursement. As stated, at this pleading stage, Relator need not "identify a specific claim for payment . . . ." *Foglia*, 754 F.3d at 156 (quoting *Wilkins,* 659 F.3d at 308). The Court finds that the SAC "suffices to give [Wakefield] notice of the charges against it, as is required by Rule 9(b)." *Foglia*, 754 F.3d at 158. In addition, Wakefield has access to the documents that "could prove or disprove" the allegations in the SAC. *See United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 258 (3d Cir. 2016). For these

reasons, the Court finds that Relator has adequately alleged a prima facie FCA claim and satisfied

the heightened pleading standard of Rule 9(b).[3]

---

[3] Wakefield similarly argues that "[f]or all the reasons requiring dismissal of Relator's federal FCA claims, Relator's state claims should be dismissed." (MTD at 20.) Wakefield also seeks the Court to decline to exercise supplemental jurisdiction if it were to dismiss the federal claims. (*Id.* at 21.) As Wakefield does not advance any new arguments other than those already rejected, the Court denies Wakefield's Motion as to the state law claims.

Wakefield further argues that the *Qui Tam* provisions of the FCA are unconstitutional, and thus Relator does not have standing to bring his claims. (MTD at 19.) Wakefield cites to Justice Thomas's dissent in *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 449 (2023). Wakefield itself gives this specious argument short shrift, consisting only of two paragraphs in its 22-paged brief. (*See id.* at 19–20.) A court is not bound by a Supreme Court dissent. *See Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 273 (2020). Moreover, the Supreme Court has explained, based on the "long tradition of *qui tam* actions in England and the American Colonies," that the "United States' injury in fact suffices to confer standing" upon relators in FCA matters, thus belying any contention that *Qui Tam* actions are unconstitutional. *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 774 (2000). As such, the Court rejects Wakefield's argument that Relator does not have standing to assert these claims or the FCA violates the Constitution.

**IV.** <u>**CONCLUSION**</u>

For the foregoing reasons, Wakefield's Motion to Dismiss is **DENIED**. An appropriate

Order will accompany this Opinion.

_____
**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

<u>Dated</u>: June 30, 2024

20